******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, C. J., with whom MULLINS and ECKER, Js., join, dissenting. I respectfully disagree with the majority's conclusion that the definition of the term "supervisor" adopted by the United States Supreme Court in *Vance* v. *Ball State University*, 570 U.S. 421, 424, 450, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013), for purposes of establishing vicarious liability under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq. (2018), is the correct standard to apply to hostile work environment claims brought under the Connecticut Fair Employment Practices Act (state act), General Statutes § 46a-51 et seq. Consistent with Connecticut's robust antidiscrimination scheme, I would adopt a broader definition of the term "supervisor" that motivates employers to foster work environments that are free from discrimination. Specifically, I would include within the definition of supervisor not only individuals vested with the authority to make or recommend tangible employment decisions, but also those authorized to direct the daily work activities of subordinate employees. Because I conclude that the *Vance* definition of supervisor is too narrow to apply to hostile work environment claims brought under the state act, like those of the plaintiff, Tenisha O'Reggio, I would reverse the judgment of the Appellate Court. See *O'Reggio* v. *Commission on Human Rights & Opportunities*, 219 Conn. App. 1, 19–20, 293 A.3d 955 (2023). Accordingly, I respectfully dissent.

At the outset, I agree with the majority's recitation of the statement of the facts, procedural history, and standard of review applicable to this certified appeal. I also agree with the majority's description of the *Ellerth/ Faragher* body of federal case law, setting forth the burden of proof in hostile work environment cases, under which a harasser's supervisor status is significant in determining whether an employer bears the burden of proof in the form of an affirmative defense. See

*Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742, 762–65, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher* v. *Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). Where I part company with the majority is its adoption of the *Vance* definition of the term "supervisor" for claims brought under the state act.

Although the majority agrees with the United States Supreme Court's description of the *Vance* definition as " 'easily workable' " and " 'appli[cable] without undue difficulty at both the summary judgment stage and at trial,' " Justice Ruth Bader Ginsburg's dissent in *Vance* astutely points out that the definition overlooks the fact that "[s]upervisors, like the workplaces they manage, come in all shapes and sizes." *Vance* v. *Ball State University*, supra, 570 U.S. 465 (Ginsburg, J., dissenting). "One cannot know whether an employer has vested supervisory authority in an employee, and whether harassment is aided by that authority, without looking to the particular working relationship between the harasser and the victim." Id. As one scholarly commentator has aptly observed, "[w]orkplaces . . . are becoming more fluid, with responsibilities shifting from one project to another. In these fluid environments, [i]t is not reasonable to expect that supervisor status can be accurately discerned solely from job descriptions or express grants of power from upper management."[1]

---

[1] "This is especially true in industries with [low wage] workers. An informal survey by the National Women's Law Center found that in ten [low income] industries, [lower level] supervisors without the authority to take tangible employment actions [nevertheless] had the authority to train new employees, assign tasks, give permission for breaks, set schedules, make teams, coach employees, and evaluate performance." J. Sheldon-Sherman, "The Effect of *Vance v. Ball State* in Title VII Litigation," 2021 U. Ill. L. Rev. 983, 1032. After the United States Supreme Court decided *Vance*, Congress attempted to restore through legislation the broader definition of supervisor embraced by the Equal Employment Opportunity Commission. See id., 1040–41 and n.359. Congress' proposed act recognized the reality for low wage workers: "Workers in industries including retail, restaurant, health care, housekeeping, and personal care, which may pay low wages and employ a large number

(Footnote omitted; internal quotation marks omitted.) J. Sheldon-Sherman, "The Effect of *Vance v. Ball State* in Title VII Litigation," 2021 U. Ill. L. Rev. 983, 1032; see also E. Lee, Note, "Simplicity v. Reality in the Workplace: Balancing the Aims of *Vance v. Ball State University* and the Fair Employment Protection Act," 67 Hastings L.J. 1769, 1787 (2016) ("[e]mployees across indus-

tries, especially [low wage] workers, find themselves 'between a rock and a hard place' when they experience harassment in the workplace—choosing between the risk of losing their job after reporting the harassment, and the risk of unsuccessfully litigating their claims under the narrow *Vance* standard"); Note, "Title VII—Employer Liability for Supervisor Harassment—*Vance v. Ball State University*," 127 Harv. L. Rev. 398, 405–407 (2013) (criticizing majority opinion in *Vance* for not considering superior-servant principle from agency law, which provides that, when "an employer's vicarious liability depends on the tortfeasor's 'superior' status, as defined in relation to the injured employee, that status does not depend on the tortfeasor's having the authority to hire or discharge the injured employee" (emphasis omitted; footnote omitted)).

Nonetheless, the majority adopts a narrow definition that allows employers to escape liability, even if the harasser had the authority to, for example, assign work, approve requests for leave, create the work schedule, provide training, and conduct performance reviews. Indeed, pursuant to the majority opinion, harassers with such control over their victims' working lives somehow

---

of female workers, are particularly vulnerable to harassment by individuals who have the power to direct day-to-day work activities but lack the power to take tangible employment actions." (Internal quotation marks omitted.) Id., 1032. "And it is precisely in these contexts—[in which] employees have limited options and harassers control significant daily work activities that affect economic and emotional well-being—that protection against workplace harassment should be paramount." Id., 1033.

are not aided in accomplishing the harassment by that very control. See *Faragher* v. *Boca Raton*, supra, 524 U.S. 803 ("[w]hen a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw [on] his superior position over the people who report to him"). Because, in my view, the authority over a subordinate employee's day-to-day working conditions, and not solely the authority to take or recommend tangible employment actions, aids a harasser in the workplace, I agree with Justice Ginsburg's adoption of the more expansive definition of the term "supervisor" that had been promulgated by the United States Equal Employment Opportunities Commission (EEOC) prior to *Vance*. See U.S. Equal Employment Opportunity Commission, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors (last modified March 29, 2010) p. 4, available at http://www.eeoc.gov/policy/docs/harassment.pdf (last visited July 30, 2024).

Guided by the realities of the twenty-first century workplace, I conclude that the definition of "supervisor" for purposes of an employer's vicarious liability for hostile work environment claims under the state act should include an individual who directs an employee's day-to-day working conditions, in addition to one who is authorized to take tangible employment actions. The prospect of filing a hostile work environment complaint against an individual with the authority to affect an employee's day-to-day life at work by, for example, changing schedules, rejecting time off requests, assigning extra work, or giving a poor performance review is likely just as intimidating to an employee as filing a complaint against an individual who can take a tangible employment action. Indeed, in many cases, employees have regular interaction only with a superior who can direct their daily work activities, and not with a superior who can fire them. By removing these individuals from

the definition of "supervisor," employers throughout the state "will have a diminished incentive" to train the individuals who "actually interact" with the employees. (Internal quotation marks omitted.) *Vance* v. *Ball State University*, supra, 570 U.S. 468 (Ginsburg, J., dissenting); see M. Chamallas, "Two Very Different Stories: Vicarious Liability Under Tort and Title VII Law," 75 Ohio St. L.J. 1315, 1329 (2014) (negligence standard "is largely oblivious to systemic problems," whereas "strict liability provides greater incentives for employers to think [system wide] and to address the culture of the organization").

I agree with the plaintiff's argument that the remedial purpose of the state act weighs against adopting *Vance*'s unrealistically narrow definition of the term "supervisor." Although both the state act and its legislative history are silent on the definition of "supervisor," which is itself a term that is a product of the case law interpreting Title VII, a broader definition of "supervisor" that includes individuals who have the authority to direct daily work activities better effectuates "the noble purpose" of the state act, namely, "to create an effective machinery in this state for the elimination of discrimination in employment." 8 H.R. Proc., Pt. 7, 1959 Sess., p. 2584, remarks of Representative Robert Satter. In restricting the definition of the term "supervisor," the United States Supreme Court "[shut] from sight the robust protection against workplace discrimination Congress intended Title VII to secure." (Internal quotation marks omitted.) *Vance* v. *Ball State University*, supra, 570 U.S. 463 (Ginsburg, J., dissenting). Adopting the limited *Vance* definition for purposes of the state act frustrates the intent of the legislature by limiting the robust protections against workplace discrimination that the legislature envisioned in enacting the state act.

My most significant disagreement with the majority comes from its apparent determination that, without

clear legislative history indicating otherwise, Connecticut antidiscrimination statutes should *always* be interpreted in accordance with federal antidiscrimination laws.[2] Instead, I am persuaded that "federal law defines the beginning and not the end of our approach to the

---

[2] The majority relies on *Commission on Human Rights & Opportunities* v. *Echo Hose Ambulance*, 322 Conn. 154, 160, 140 A.3d 190 (2016), in which this court observed that it previously had "recognized that our legislature's intent, in general, was to make [the state act] complement the provisions of Title VII." This oft recited proposition, however, is based on a long line of cases that misinterprets the legislature's intent and compounds the error through sheer repetition. I note that the legislature first enacted the state act in 1947, seventeen years before Congress passed Title VII in 1964. See General Statutes (Supp. 1947) §§ 1360i through 1366i. Thus, there can be no legislative history from that time discussing an intention to make the state act complement a nonexistent federal law. The idea that the legislature's intent was to make the state act complement Title VII comes from an amendment to the state act in 1967. At that time, Title VII prohibited discrimination in employment based on sex, but the state act did not. Thus, the legislature passed a bill that purported to "[bring] the [state] act in line with Title [VII] . . . ." 12 S. Proc., Pt. 3, 1967 Sess., p. 1091, remarks of Senator Frederick Pope, Jr. Thereafter, this court, in *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities*, 170 Conn. 327, 365 A.2d 1210 (1976) (*Pik-Kwik*), concluded that, "[a]lthough the language of the federal statute and that of the [state act] differ slightly, it is clear that the intent of the legislature in adopting 1967 Public Acts, No. 426 (which extended the provisions of the [state act] . . . to prohibit discrimination on the basis of sex) was to make the [state act] coextensive with the federal [statute] . . . ." (Citation omitted.) Id., 331. In 1982, however, that quote from *Pik-Kwik* was truncated in *Wroblewski* v. *Lexington Gardens, Inc.*, 188 Conn. 44, 53, 448 A.2d 801 (1982), in which this court observed that it had "previously confirmed our legislature's intention 'to make the [state act] coextensive with the federal [statute].' " In my view, by truncating the quote from *Pik-Kwik*, this court's decision in *Wroblewski*, and the very lengthy line of cases that follows, misinterprets *Pik-Kwik* and the legislature's intention with respect to the state act. The legislature's desire to add sex as a protected class to bring the state act in line with Title VII is emphatically not the same as the legislature's declaration of its intention that the state act always complement Title VII. Indeed, had the legislature desired this court to follow federal case law in interpreting the state act, it could have clearly expressed that intention, as it has done in other areas, such as in the Connecticut Antitrust Act, General Statutes § 35-24 et seq., which expressly provides that "[i]t is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal

subject." (Internal quotation marks omitted.) *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 470, 559 A.2d 1120 (1989); see, e.g., *Vollemans* v. *Wallingford*, 103 Conn. App. 188, 199, 928 A.2d 586 (2007) ("while often a source of great assistance and persuasive force . . . it is axiomatic that decisions of the United States Supreme Court are not binding on Connecticut courts tasked with interpreting [the] General Statutes" (citation omitted; internal quotation marks omitted)), aff'd, 289 Conn. 57, 956 A.2d 579 (2008). This court should, of course, rely on persuasive federal precedent, particularly when the federal interpretation supports an expansive reading of the state act. When the federal interpretation is narrow or restrictive, however, this court must remember that "we have interpreted our statutes even more broadly than their federal counterparts, to provide *greater* protections to our citizens, especially in the area of civil rights." (Emphasis in original.) *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn., Inc.*, 273 Conn. 373, 386 n.11, 870 A.2d 457 (2005).

Like many standards in employment law developed by the United States Supreme Court, the definition of the term "supervisor" is not found in the statutory text of Title VII and was judicially articulated based on public policy considerations. See, e.g., *Faragher* v. *Boca Raton*, supra, 524 U.S. 804–805, 807–808 (*Ellerth/Faragher* affirmative defense was created by United States

---

antitrust statutes." General Statutes § 35-44b; see, e.g., *Tremont Public Advisors, LLC* v. *Connecticut Resources Recovery Authority*, 333 Conn. 672, 693, 217 A.3d 953 (2019) ("this court follow[s] federal precedent when [it] interpret[s] the [Connecticut Antitrust] [A]ct *unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently*" (emphasis in original; internal quotation marks omitted)). Thus, federal law can be a guide but should not be a command, as we must remember that "Connecticut is the final arbiter of its own laws." *Johnson* v. *Manson*, 196 Conn. 309, 319, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986).

Supreme Court as result of policy considerations and has no express textual support in Title VII); *Meritor Savings Bank*, *FSB* v. *Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (requirement that harassment "be sufficiently severe or pervasive" as to amount to actionable discrimination is standard created by United States Supreme Court); see also *Haskenhoff* v. *Homeland Energy Solutions*, *LLC*, 897 N.W.2d 553, 611–12 (Iowa 2017) (Appel, J., concurring in part and dissenting in part) (citing cases). In these cases, and in *Vance*, "the federal courts have imposed an analytical structure [on] statutes that is not directly drawn from the federal statutes." S. Sperino, "Revitalizing State Employment Discrimination Law," 20 Geo. Mason L. Rev. 545, 574 (2013). Therefore, as one scholar rightly noted, "there is greater reason to be skeptical about importing these concepts into state law." Id., 573. I am indeed skeptical about importing the narrow *Vance* definition into our state law because "it fails to effectuate both the legislative policy underlying the [state act] and the remedial nature thereof . . . ." *Vollemans* v. *Wallingford*, supra, 103 Conn. App. 200 n.10. Instead, *Vance* "forces the realities of the workplace into an [ill fitted] set of descriptions, definitions, and standards"; L. Davenport, Comment, "*Vance v. Ball State University* and the Ill-Fitted Supervisor/Co-Worker Dichotomy of Employer Liability," 52 Hous. L. Rev. 1431, 1433 (2015); see id., 1461; and "will [therefore] hinder efforts to stamp out discrimination in the workplace." *Vance* v. *Ball State University*, supra, 570 U.S. 468 (Ginsburg, J., dissenting).

My conclusion that the definition of supervisor should include both an individual authorized to undertake or recommend tangible employment decisions and one with authority to direct the employee's daily work activities also finds support in a decision from New Jersey, *Aguas* v. *State*, 220 N.J. 494, 528, 107 A.3d 1250

(2015), in which the New Jersey Supreme Court rejected the narrow *Vance* definition of supervisor in favor of the more expansive definition adopted by the EEOC. In *Aguas*, the plaintiff correction officer claimed that two of her supervisors subjected her to sexual harassment in the workplace and sought to impute liability to their employer. See id., 499, 505–506. Because the term supervisor was not defined by New Jersey's antidiscrimination law or in its case law, the court considered both the EEOC and *Vance* definitions of the term. See id., 526–28. In declining "to adopt the restrictive definition of 'supervisor' prescribed by the [United States] Supreme Court majority in *Vance*," the New Jersey court concluded, among other things, that "[t]he EEOC definition takes into account the broad range of employer structures and factual settings in which . . . harassment occurs." Id., 528. Additionally, the court determined that "the more expansive definition of 'supervisor' furthers the paramount goal of the [New Jersey antidiscrimination law]: the eradication of sexual harassment in the workplace. It prompts employers to focus attention not only on an elite group of [decision makers] at the pinnacle of the organization, but on all employees granted the authority to direct the day-to-day responsibilities of subordinates, and to ensure that those employees are carefully selected and thoroughly trained." Id. In my view, a more expansive definition of "supervisor" would have the same salutary effects for employers and employees in Connecticut.

In sum, I conclude that the Appellate Court incorrectly applied the *Vance* definition of the term "supervisor" in determining whether the department employer, the state Department of Labor, was vicariously liable under the *Ellerth/Faragher* framework. Instead, for purposes of the state act, I would define a supervisor as an employee empowered by the employer (1) to undertake or recommend tangible employment decisions

affecting the employee, or (2) to direct the employee's daily work activities. I therefore respectfully disagree with the majority's failure to consider that "[a] supervisor with authority to control subordinates' daily work is no less aided in his harassment than is a supervisor with authority to fire, demote, or transfer." *Vance* v. *Ball State University*, supra, 570 U.S. 457–58 (Ginsburg, J., dissenting).

Because I would reverse the judgment of the Appellate Court, I respectfully dissent.